IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
August 6, 2025 Session

**ELLEN MARIE CALI v. ROBERT GEORGE CALI**

**Appeal from the Chancery Court for Madison County**
**No. 80978     Steven W. Maroney, Chancellor**

———————————————————

**No. W2024-00773-COA-R3-CV**

———————————————————

In this divorce case, Father/Appellant appeals the trial court's: (1) allocation of parenting time; (2) inclusion of special provisions in the parenting plan; (3) finding that Father was willfully underemployed; (4) award of an upward deviation in Father's child support obligation; (5) division of the marital estate; and (6) grant of Mother/Appellee's petition for divorce on the ground of inappropriate marital conduct.  Discerning no error, we affirm. Wife's request for appellate attorney's fees is granted.

**Tenn. R. App. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed and Remanded**

KENNY ARMSTRONG, J., delivered the opinion of the court, in which JOHN W. MCCLARTY and VALERIE L. SMITH, JJ., joined.

J. Noble Grant, III, Jackson, Tennessee, for the appellant, Robert George Cali.

Jennifer Finch McEwen, Trenton, Tennessee, for the appellee, Ellen Marie Cali.

**OPINION**

**I. Background**

On December 15, 2012, Appellee Ellen Marie Cali ("Mother") and Appellant Robert George Cali ("Father") were married.  Two children were born to the marriage, Isaiah (d/o/b October 2015) and Selah (d/o/b September 2019) (together, the "Children"). Isaiah has special needs due to his autism and attention deficit hyperactivity disorder ("ADHD") diagnoses.  During the parties' marriage, Isaiah was diagnosed with cancer, underwent treatment, and made a full recovery.  In the fall of 2015, Father was diagnosed with obsessive-compulsive disorder ("OCD").  Father's OCD manifests in behaviors such

as sniffing, a need for symmetry, and an intense focus on precision and detail. Father takes medication and participates in therapy to manage his symptoms. Father has a bachelor's degree in Christian Ministry with a minor in Teaching English as a second language. Additionally, Father has a Master of Divinity Degree. In March 2020, Father obtained his commercial driver's license and began working part-time as a truck driver towards the end of the parties' marriage. Mother is a registered nurse.

The record is replete with numerous filings from both parties. In the interest of judicial economy, only those pleadings that concern the issues in this appeal are discussed below.

On December 20, 2021, Mother filed a complaint for divorce. Therein, she alleged, *inter alia*, that Father was guilty of inappropriate marital conduct, which "render[ed] cohabitation unsafe and improper." In her proposed parenting plan, Mother asked that she be designated the Children's primary residential parent with 265 days of parenting time and Father receiving 80 days of parenting time. On January 25, 2022, Father filed an answer, denying inappropriate marital conduct. Father's proposed parenting plan designated him as the Children's primary residential parent and allowed Mother 182 days and Father 183 days with the Children.

In March 2022, Selah was diagnosed with terminal brain cancer, and Mother and Father took leaves of absence from their respective jobs. Although Mother eventually returned to full-time employment, during the pendency of these proceedings, Father did not.

On July 5, 2022, Father filed a counterclaim for divorce, alleging, *inter alia*, that Mother was guilty of inappropriate marital conduct. That same day, Father filed a motion to appoint a guardian ad litem ("GAL") for the Children. Mother filed an answer to the counterclaim, denying inappropriate marital conduct as well as a response indicating that she did not object to the appointment of a GAL. By order of July 12, 2022, the trial court appointed Bob Hooper as the Children's GAL.

The final trial occurred on June 26 and June 27, 2023. The following witnesses testified: (1) Mother; (2) Gina Rice, the principal of Isaiah's school; (3) Charles Bone, maternal grandfather; (4) Father; (5) Connie Coleman, a friend from the parties' church; and (6) Tony Cali, paternal grandfather. At the close of trial, the trial court made an oral ruling.

On September 21, 2023, the trial court entered a Final Decree of Divorce, which incorporated its oral ruling from June 27, 2023. The trial court's findings of fact are contained in its oral ruling. Therein, the trial court: (1) granted Mother a divorce on the grounds of inappropriate marital conduct; (2) classified, valued, and divided the marital estate, with Mother receiving 69% of the estate and Father receiving 31%; (3) entered a

Permanent Parenting Plan (the "Parenting Plan") designating Mother as the primary residential parent of the Children and awarding her 285 days with Selah and 275 days with Isaiah and awarding Father 80 days with Selah and 90 days with Isaiah; (4) found that Father was willfully underemployed; and (5) awarded an upward deviation in Father's child support obligation.

On October 23, 2023, Father filed a motion to alter or amend. Before the motion was heard, on November 21, 2023, Selah succumbed to cancer. In view of Selah's death, Father filed a motion to modify child support on December 29, 2023.

On March 18, 2024, the trial court heard the motion to alter or amend and to modify child support. By order entered April 30, 2024, the trial court denied the motion to alter or amend except to modify the exchange of Isaiah on Father's Friday visitations. The trial court modified Father's child support obligation to $397.00 per month, but maintained the upward deviation, as previously ordered. On May 29, 2024, Father filed a timely notice of appeal.

## II. Issues

Father raises eight issues for our review, as stated in his brief:

1. The trial court failed to make required findings in regard to the division of marital property pursuant to Rule 52.01 of the Tennessee Rules of Civil Procedure.

2. The trial court's division of marital property is inequitable.

3. The trial court erred by finding Father to be willfully underemployed.

4. The trial court failed to make findings and properly analyze factors in Tennessee Code Annotated Section 36-6-106.

5. The trial court erred by failing to fashion a parenting plan that maximizes each parent's participation in the lives of the children.

6. The trial court erred in ordering an upward deviation of Father's child support obligation.

7. The trial court erred by including overreaching injunctive relief in the Permanent Parenting Plan.

8. The trial court erred in finding that Father has emotionally abused and stalked Mother.

- 3 -

Mother asks this Court to award her appellate attorney's fees and costs

## III. Standard of Review

We review a non-jury case "*de novo* upon the record with a presumption of correctness as to the findings of fact, unless the preponderance of the evidence is otherwise." ***Bowden v. Ward***, 27 S.W.3d 913, 916 (Tenn. 2000) (citing Tenn. R. App. P. 13(d)). The trial court's conclusions of law are reviewed *de novo* and "are accorded no presumption of correctness." ***Brunswick Acceptance Co., LLC v. MEJ, LLC***, 292 S.W.3d 638, 642 (Tenn. 2008). Given the number of issues raised in this appeal, where a standard of review differs from that set out above, we discuss it under that issue.

We also note that this Court is "required to defer to the trial court's credibility findings, including those that are implicit in its holdings." ***Williams v. City of Burns***, 465 S.W.3d 96, 120 (Tenn. 2015); *see also* ***Street v. Street***, No. E2016-00531-COA-R3-CV, 2017 WL 1177034, at *7 (Tenn. Ct. App. Mar. 29, 2017). In ***Wells v. Tennessee Board of Regents***, 9 S.W.3d 779 (Tenn. 1999), the Tennessee Supreme Court explained that

> trial courts are able to observe witnesses as they testify and to assess their demeanor, which best situates trial judges to evaluate witness credibility. *See* ***State v. Pruett***, 788 S.W.2d 559, 561 (Tenn. 1990); ***Bowman v. Bowman***, 836 S.W.2d 563, 566 (Tenn. Ct. App. 1991). Thus, trial courts are in the most favorable position to resolve factual disputes hinging on credibility determinations. *See* ***Tenn-Tex Properties v. Brownell-Electro, Inc.***, 778 S.W.2d 423, 425-26 (Tenn. 1989); ***Mitchell v. Archibald***, 971 S.W.2d 25, 29 (Tenn. Ct. App. 1998). Accordingly, appellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary. *See* ***Humphrey v. David Witherspoon, Inc.***, 734 S.W.2d 315, 315-16 (Tenn. 1987); ***Bingham v. Dyersburg Fabrics Co., Inc.***, 567 S.W.2d 169, 170 (Tenn. 1978).

***Wells***, 9 S.W.3d at 783. We discuss, *infra*, one instance where the trial court explicitly found Mother's testimony more credible than Father's. However, we observe that, throughout the trial, the parties often gave conflicting and/or opposite testimony concerning the same occurrence, subject, or issue, but the trial court consistently made findings crediting Mother's testimony, rather than Father's. As such, we deduce that the trial court implicitly found Mother to be the more credible party. With the foregoing in mind, we turn to the substantive issues.

## IV. Analysis

### A. Father's Behavior Throughout the Pendency of the Divorce

At the outset, we address Father's behavior during the divorce as it affected numerous rulings of the trial court. As the trial court noted at the beginning of its oral findings, Father was very candid concerning his diagnoses of OCD and ADHD. As the trial court stated, it was not necessary for the trial court to attempt to resolve or diagnose Father with any other disability or mental health disorder as there was no credible medical evidence presented to support same. However, the trial court found it important to note the following:

> Now, that being said, [Father] has – he has, during this case, demonstrated some behaviors, and I'm not just talking about what's happened in the two days we've been here. We've had multiple hearings in this case. He has, at times, engaged in behavior that the [c]ourt has scolded him about. Some of those have been brought up in this trial. It sounds to the [c]ourt like some of them may have been resolved and put in the past, a fact which the [c]ourt appreciates, but some of the deeper restrictions that have been put on him came about, in part, because of some behaviors that were concerning to the [c]ourt, such as early in this matter when the [c]ourt tried to have more liberalized visitation due to Selah's diagnosis, as I've mentioned before, that did not go well, and it primarily, in the [c]ourt's opinion, did not go well because of [Father's] behavior of unnecessarily videoing [Mother] when she came to visit the home, sometimes strapping a video camera around his head, such as one might see on a coal miner's light, and just following her and watching her in that fashion. Now, I haven't heard recent episodes of that. I'm glad if that – absence of that means that's decreased, but these are behaviors that are concerning. Some of the – some of the behaviors that have been brought out have been concerning about behaviors at the hospital by [Father]. In court, he has I will note, he's been on good behavior during this lengthy two-day trial. . . . He has some behaviors that that can represent some social awkwardness that might be issues that are at the core of some of the relationship problems between these parties, but I felt it's important to address all that at the beginning, because there have been some difficult behaviors[.]

Like the trial court, it is not the role of this Court to make any diagnoses concerning Father's mental or emotional health. However, because so many of the trial court's rulings were influenced by the behavior Father exhibited throughout this litigation, we have reviewed the record concerning these behaviors and conclude that there is ample proof of Father's worrisome behaviors to support the trial court's findings. While we need not detail every instance, some of Father's behaviors are discussed below and will be discussed further throughout this Opinion.

Briefly, the record shows that, at the beginning of litigation, after Selah was diagnosed with terminal cancer, hoping to maximize each parents' time with the child, the

trial court entered a temporary order allowing the parents to visit with her at the other parent's residence on the days they were off work but did not have a regular visit scheduled. At a hearing in July 2022, Mother testified (with photographic proof) that, during these additional visits with Selah, Father would sit outside one of the Children's rooms either holding a cell phone or with a cell phone strapped to his head, videoing Mother's time with Selah. In its oral findings from this hearing, the trial court noted that Father had "abused the bounds of good sense," in recording Mother during these visits. As a result, the trial court entered an order prohibiting the parties from any recording of the other parent. Also, during this hearing, Mother introduced emails and text messages from Father demonstrating his verbal and/or emotional abuse. As a result, the trial court ordered that the parties communicate solely using the Our Family Wizard application. Mother also introduced an email from Father, which he sent to several of Mother's nursing school professors after learning that Mother was scheduled to lecture at the nursing school concerning pediatric oncology. In the lengthy email, Father explained that Mother had filed for divorce, and he asked for a recording of Mother's portion of the lecture and any "Q & A" that followed. While the trial court found that the statutory injunction did not prohibit such behavior, it was "enormously poor judgment" on Father's part to send such email, and it was "not a good idea to drag yet more people into . . . the drama that's been created here[.]" Ultimately, the trial court ended the impromptu visitations with Selah, finding that it was "an abysmal failure." As noted above in its oral findings at the final trial, it was the trial court's opinion that such visits were a failure due to Father's behavior. In structuring a new temporary parenting plan, the trial court found that, "instead of being able to have the flexibility that grace would provide, [the trial court had] to be pretty tight, pretty strict," as it was "the only way that it seem[ed] [the parties would] get through this." In doing so, the trial court adopted the majority of Mother's temporary parenting plan, discussed further *infra*, which contained very detailed rules and regulations for the parties.

At the final trial, Mother testified that Father continued to record her despite the trial court's previous order prohibiting it. Mother also introduced several messages from Father from the Our Family Wizard application. These messages demonstrated that Father's verbal and/or emotional abuse continued. Mother also testified about other concerning behaviors that Father displayed throughout the marriage and the pendency of divorce. In one instance, Mother testified that the parties were at St. Jude for an appointment with Selah when Father became so upset that he blocked the door from the hospital room to the hallway so that Mother could not leave with the child. Mother testified that Father frequently "trapp[ed]" Mother and the Children in different locations; when he was angry, he would take Mother's car keys, and he would not let her leave the house with the Children. In another instance, Mother testified that she and Father had tickets to see the Lion King at the Orpheum in Memphis, but Father was not ready to leave Jackson in time to make the show.[1] Mother made the decision to take Isaiah instead; she informed Father

---

[1] Mother testified that Father was frequently late and, in this instance, had "another . . . 45 minutes to an hour left to get ready."

of her decision, and drove to Memphis with the child. When she arrived at the Orpheum, Father was there. Father, who had followed Mother and Isaiah to Memphis, made his way into the Orpheum without a ticket, followed Mother and Isaiah to their seats, and "wouldn't let [them] out of arm's length" from him. When Mother communicated to Father that his following them to Memphis frightened her, Father's response was to blame Mother for being scared, calling her "neurotic" and "overbearing."

Finally, the record shows that Father refused to allow Mother to call the Children during the weeks Father was on vacation with them.[2] Father insisted that Mother could only call the Children on the day she dropped them off or on the day she picked them up, but never during the week. Mother testified that, during the week of Spring Break, Selah's condition greatly declined such that Mother immediately transported her to St. Jude when the parties exchanged the Children. During his visit, Father did not communicate this decline to Mother. Given Selah's terminal condition and Father's refusal to allow Mother communication with the Children, particularly Selah, Mother testified that she was "afraid that [Selah would] pass while she's with [Father] and that [Father] wouldn't call [Mother]." Mother was afraid she would not be able to "say goodbye" to her daughter. As discussed more thoroughly below, these and other behaviors led to the trial court: (1) designating Mother as the Children's primary residential parent; (2) awarding Mother the majority of parenting time with the Children; (3) awarding Mother sole decision-making authority over major decisions; (4) implementing very specific rules in the Parenting Plan; and (5) awarding Mother a divorce on the ground of inappropriate marital conduct. With the foregoing in mind, we turn to the substantive issues.

## B. Issues concerning Isaiah

We now turn to the issues concerning Isaiah. Although we focus on Isaiah, because the parties presented evidence and the trial court made findings concerning both Children, some facts concerning Selah are included in our discussion as necessary. On appeal, Father alleges that the trial court: (1) failed to make findings and analyze the factors in Tennessee Code Annotated section 36-6-106; (2) failed to enter a parenting plan that maximized each parent's participation in Isaiah's life; and (3) entered a parenting plan that included overreaching injunctive relief. Father also appeals the trial court's child support award, specifically its finding that Father was willfully underemployed and its upward deviation of Father's child support obligation.

### i. Parenting Plan Issues

#### 1. Trial Court's Consideration of Best Interest Factors
#### (Tenn. Code Ann. § 36-6-106(a))

---

[2] Perhaps most cruel, Father refused to allow Mother to call Selah during her Make-a-Wish trip to Disney World.

Under Tennessee Code Annotated section 36-6-404(a), any final decree for a divorce involving a minor child shall incorporate a permanent parenting plan into the decree. Tenn. Code Ann. § 36-6-404(a).[3] A permanent parenting plan is "a written plan for the parenting and best interests of the child, including the allocation of parenting responsibilities and the establishment of a residential schedule . . . ." Tenn. Code Ann. § 36-6-402(3). A permanent parenting plan shall, *inter alia*, "[e]stablish the authority and responsibilities of each parent with respect to the child," Tenn. Code Ann. § 36-6-404(a)(2), and "[a]llocate decision-making authority to one (1) or both parties regarding the child's education, health care, extracurricular activities, and religious upbringing." Tenn. Code Ann. § 36-6-404(a)(5). As mentioned, *supra*, every permanent parenting plan shall also include a residential schedule, "which designates the primary residential parent and designates in which parent's home the child will reside on given days during the year." ***Cummings v. Cummings***, No. M2003-00086-COA-R3-CV, 2004 WL 2346000, at *7 (Tenn. Ct. App. Oct. 15, 2004); *see also* Tenn. Code Ann. § 36-6-402(5).[4]

In any proceeding concerning child custody and visitation, "the best interests of the child shall be the standard by which the court determines and allocates the parties' parental responsibilities." Tenn. Code Ann. § 36-6-401(a); *see also* Tenn. Code Ann. § 36-6-106(a). The Tennessee General Assembly has expressed that "[t]he best interests of the child are served by a parenting arrangement that best maintains a child's emotional growth, health and stability, and physical care." Tenn. Code Ann. § 36-6-401(a). In determining what is in a child's best interest, trial courts "shall order a custody arrangement that permits both parents to enjoy the maximum participation possible in the life of the child consistent with the [statutory best interest] factors, the location of the residences of the parents, the child's need for stability and all other relevant factors." Tenn. Code Ann. § 36-6-106(a). This Court has reiterated that, when fashioning a permanent parenting plan,

> [t]rial courts are not simply to perform a rote examination of each [best interest] factor and tally up those in favor of each party. ***Beaty v. Beaty***, No. M2020-00476-COA-R3-CV, 2021 WL 2850585, at *3 (Tenn. Ct. App. July 8, 2021) (quoting ***Steakin v. Steakin***, No. M2017-00115-COA-R3-CV, 2018 WL 334445 at *5 (Tenn. Ct. App. Jan. 9, 2018)). Instead, the relevancy and weight of the factors depend on the specific circumstances of the case. *Id.* Indeed, any one factor may prove determinative in the trial court's analysis of an appropriate parenting plan. ***Grissom v. Grissom,*** 586 S.W.3d 387, 393 (Tenn. Ct. App. 2019) (quoting ***Solima v. Solima***, No. M2014-01452-COA-R3-CV, 2015 WL 459134, at *4 (Tenn. Ct. App. July 30,

---

[3] The versions of the statutes referenced throughout this Opinion were in effect when Mother filed the complaint for divorce.

[4] A primary residential parent is "the parent with whom the child resides more than fifty percent (50%) of the time." Tenn. Code Ann. § 36-6-402(4).

- 8 -

2015)).

***Bean v. Bean***, No. M2022-00394-COA-R3-CV, 2022 WL 17830533, at \*6 (Tenn. Ct. App. Dec. 21, 2022). Furthermore, "trial courts are vested with wide discretion in matters of child custody.'" ***Schaeffer v. Patterson***, No. W2018-02097-COA-R3-JV, 2019 WL 6824903, at \*4 (Tenn. Ct. App. Dec. 13, 2019) (quoting ***Johnson v. Johnson***, 165 S.W.3d 640, 645 (Tenn. Ct. App. 2004)). Appellate courts will not interfere with a trial court's custody determination absent an abuse of discretion. ***Dungey v. Dungey***, No. M2020-00277-COA-R3-CV, 2020 WL 5666906, at \*2 (Tenn. Ct. App. Sept. 23, 2020) (quoting ***C.W.H. v. L.A.S.***, 538 S.W.3d 488, 495 (Tenn. 2017)). A trial court abuses its discretion when "its decision is not supported by the evidence, when it applies an incorrect legal standard, [or] when it reaches a decision which is against logic or reasoning that causes injustice to the party complaining." ***Owens v. Owens***, 241 S.W.3d 478, 496 (Tenn. Ct. App. 2007) (citing ***Biscan v. Brown***, 160 S.W.3d 462, 468 (Tenn. 2005)).

In making its oral ruling concerning the Parenting Plan, the trial court first noted its responsibility to consider the best interest factors and to maximize each party's parenting time with Isaiah. Thereafter, the trial court found:

The [c]ourt has looked at those factors . . . enumerated in Tennessee Code Annotated [section] 36-6-106. Not all of those factors are applicable in this case that, in the [c]ourt's opinion, [M]other has . . . performed the majority of parenting responsibilities insofar as the daily needs of the [C]hildren are concerned. This does not suggest [that Father] has contributed not at all in that area, because he has, but the majority of those responsibilities have been attended to by [M]other.

The [c]ourt believes both parents are competent . . . and both parents love their children, but [M]other has demonstrated, during the course of this terrible illness that Selah has suffered – the [c]ourt has been satisfied that she has demonstrated a greater ability to address the ongoing medical needs that Selah has and she has demonstrated more consistency in meeting the needs of the [C]hildren in such areas as meeting their financial needs and taking steps that manifest the type of responsibility which must be manifested by a parent to care for their children. She has a full-time work schedule, but she has a flexible work schedule. In looking at these factors that are set forth, these are the factors that the [c]ourt finds most relevant from the statutory factors in 36-6-106, and so the [c]ourt declares [M]other the primary residential parent.

I've already mentioned some of the behaviors that [Father] has manifested that have been difficult. He has, at times, engaged in behaviors that create some unnecessary conflict, particularly during some of the

- 9 -

medical treatment visits that, regrettably, have been made necessary due to Selah's illness, and the [c]ourt has addressed some of the prior problems during the pendency of this matter.

We note that Father does not dispute the foregoing findings, nor does he argue that the evidence preponderates against them.

As shown above, the trial court clearly considered the best interest factors in Tennessee Code Annotated section 36-6-106(a) and made findings as to the factors it found most relevant to the case. Those factors are:

(1) The strength, nature, and stability of the child's relationship with each parent, including whether one (1) parent has performed the majority of parenting responsibilities relating to the daily needs of the child;

(2) Each parent's . . . past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents . . . to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child. In determining the willingness of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent and caregiver to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent or any caregiver denying parenting time to either parent in violation of a court order;

***

(4) The disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care;

(5) The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities;

(6) The love, affection, and emotional ties existing between each parent and the child;

***

(8) The moral, physical, mental and emotional fitness of each parent as it relates to their ability to parent the child. . . .;

- 10 -

***

(10) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

(11) Evidence of physical or emotional abuse to the child, to the other parent or to any other person. . . .;

***

(14) Each parent's employment schedule, and the court may make accommodations consistent with those schedules[.]

Tenn. Code Ann. § 36-6-106(a)(1), (2), (4), (5), (6), (8), (10), (11), (14).  Accordingly, Father's initial argument that the trial court failed to "make findings and properly analyze" the best interest factors is without merit.

## 2.  Father's Parenting Time

Father also argues that the "Parenting Plan ordered by the trial court limits Father's parenting time with no just reason for doing so," and that the trial court's order is inconsistent with the best interest factors, discussed above.  Father does not ask this Court for specific relief, rather, he requests that "[t]he trial court's decision . . . be reversed with instructions to maximize Father's participation in the child's life."  We deduce from his arguments that Father's issue concerns his parenting time, rather than the trial court's designation of Mother as the primary residential parent with sole decision-making authority.  Accordingly, we focus on the trial court's award of 275 days of parenting time to Mother and 90 days of parenting time to Father.

As discussed above, Father's behavior during the pendency of the divorce was problematic.  Despite the trial court's attempt to allow the parties flexible and extended visits with Selah, the trial court concluded that this effort was an "abysmal failure" due to Father's behavior.  At the beginning of the case, after Father displayed controlling, abusive, and manipulative behaviors, the trial court entered a "pretty tight, pretty strict" temporary parenting plan.  Under the temporary parenting plan, Father was awarded 80 days of parenting time with Isaiah.  At trial, Mother testified that the parties were better able to operate under the temporary parenting plan because it was very specific and detailed and brought "peace" and "extreme clarity."  Mother also testified that her proposed permanent parenting plan was very similar to the temporary parenting plan in that it awarded her most of the parenting time, while also allowing Father to be present and active in Isaiah's life.  When asked on cross-examination whether Father should be provided more parenting time under a permanent parenting plan, Mother responded:

. . . [J]ust kind of to step back and kind of pull it all back, we have the parenting plan that we have, and [Father's] time is so restricted because of his choices, and so I guess what I feel like we're talking about today is ha[ve] his choices and his behavior changed to where he should have more time, and I think the answer to that is "no." A year ago, he was barely working, he was videoing me all the time, he was impossible to coparent with, and he was contacting my professional contacts to try to cut me off from support. Currently, he's barely working. His pay stub that y'all submitted in discovery said he's made $1,000.00 this year. He's only worked 60 hours. He's still videoing me – we submitted evidence to that yesterday even though he's under a court order not to do so. He's still – he's contacting my friends and family to try to alienate me from them, and just like we submitted yesterday, he's almost impossible to coparent with. So, I mean, I think – like we can talk about the other things, but for me that's that's the main reason that I don't think he should have more time, is because the behavior that got us here hasn't changed.

In creating the final Parenting Plan, the trial court considered both parties' proposed parenting plans, used sections from each, and added its own provisions. As to parenting time with Isaiah, the trial court "considered the need for stability and the overall history of how the parties have conducted themselves in this matter[.]" During the school year, the trial court adopted Mother's day-to-day schedule, which consisted of Father receiving visitation, every other weekend from Friday at 5:00 p.m. until Sunday at 5:00 p.m., with the exception that Father would receive a midweek visit every Tuesday from the time school was dismissed through 7:30 p.m. During the summer, Father was awarded visitation from Wednesday at 5:00 p.m. until Sunday at 5:00 p.m. every other week. The trial court stated that, in creating this visitation schedule, it did not want "to disrupt Isaiah's school year any more than necessary."

We recall that the trial court is vested with wide discretion when making custody determinations, and we will not interfere with such order unless there has been an abuse of discretion. On our review, we conclude that the record supports the trial court's custody determination. As an initial matter, the record supports the trial court's finding that Mother performed the majority of parenting responsibilities insofar as the daily needs of the Children were concerned. It is also clear that Mother was responsible for coordinating the Children's medical appointments. Ms. Rice, the principal at Isaiah's school, testified that Mother was the primary contact for Isaiah's school, and that Mother was a very involved and responsible parent. We note that Mother was able to perform the following responsibilities while maintaining full-time employment. Conversely, the record shows that Father has difficulty with time management, planning, emotional stability, and the overall ability to consistently and reliably show up and provide for Isaiah. As noted above, the trial court found that the Parenting Plan provided Isaiah with more stability, particularly

during the school year. Indeed, the record shows that, due to his autism diagnosis, Isaiah struggles when his routine or schedule changes, and that he does best with consistency and a known schedule. Accordingly, there is evidence to support the trial court's unwillingness to order a schedule that requires Isaiah to frequently change residences during the school year. As Mother testified, the Parenting Plan allows Mother to provide Isaiah with the stability and consistency he requires while also allowing Father to be present in his life. For the foregoing reasons, we affirm the trial court's allocation of parenting time.

### 3. Special Provisions in the Parenting Plan

Next, Father argues that the trial court "include[d] overbroad injunctive relief" in the Parenting Plan. Tennessee Rule of Civil Procedure 65.01 provides that injunctive relief may be obtained as a permanent injunction in a final judgment, which "may restrict or mandatorily direct the doing of an act." Tenn. R. Civ. P. 65.01. Every injunction "shall be specific in terms and shall describe in reasonable detail . . . the act restrained or enjoined." Tenn. R. Civ. P. 65.02 (1). "When a trial court decides to grant an injunction, several factors are to be considered such as the danger of irreparable harm, the inadequacy of other remedies, the benefit to the plaintiff, the harm to the defendant, and the public interest." *Zion Hill Baptist Church v. Taylor*, No. M2002-03105-COA-R3-CV, 2004 WL 239760, at *5 (Tenn. Ct. App. Feb. 9, 2004) (citations omitted). We review a trial court's decision to grant injunctive relief under an abuse of discretion standard. *Bd. of Comm'rs of Roane County v. Parker*, 88 S.W.3d 916, 919 (Tenn. Ct. App. 2002).

Father takes issue with the following provisions in the Parenting Plan:

**J. OTHER**

The following special provisions apply:

\*\*\*

(7) **Random Gifts to Children**: Neither parent shall present gifts to either of the [C]hildren except during his/her own visitation time when it is not a birthday, Christmas, or other federal holiday of the child.

(8) **Attendance of Children and Parents at Birthdays or Kids' Parties**: When the [C]hildren in this plan have birthday parties of friends they would like to attend, the parent who has the child that day shall attend the party; and the other parent shall not attend that party. This is meant to address non-family birthday parties. Both parents will make all reasonable attempts to take their [C]hildren in their care to birthday parties of the [C]hildren's friends when available. This also applies to other party invitations from other children such as swimming parties, etc.

- 13 -

(9) **Field Trips and Other Special Events of Children**: At the beginning of each semester, Mother will identify the school events that include parent participation or invitation. This is different than "spectator events" which anyone can come and watch. Father gets his choice of the non-spectator events to attend and will let [M]other know after she communicates the event schedule to him. Mother will take the remainder. Regarding Christmas and Thanksgiving school events, whoever has the [C]hildren on those dates shall go to those events. Special events do not include regularly scheduled church, school days, sports, or award days. For example, this includes field trips, holiday parties, school lunches at which parents are invited, etc. Birthday parties of other children or adults are not extracurricular activities or other special events. If it is appropriate for both parties to attend, like a play versus a field trip where only one really should attend, both parents may attend. *If a new event is added to the calendar by the school, [M]other will notify [F]ather and he can choose whether he wants to attend and that event will be rotated unless otherwise agreed. Neither party is prohibited from attending spectator events.*

***

(13) **GPS Devices on Children and Children's Communication Devices**: The [C]hildren shall be permitted and the other parent will ensure that all communication devices of the [C]hildren provided by the nonvisiting parent will remain with that child during the visit with the other parent and will remain reasonably charged, with all GPS tracking turned on the entire time.

(Emphasis in original). The trial court adopted the foregoing special provisions from Mother's proposed parenting plan. At the outset, we note that each of these provisions apply to the parents equally, with Father being given the first choice of which "non-spectator events" he would attend.

Concerning Section J, the trial court found that Mother had proposed "a lot of detail," which the trial court found appropriate given the parties' history. Where the trial court adopted Mother's proposed plan, it stated that Father's behavior throughout the litigation influenced its decision to follow Mother's suggestions. As to section 7, the trial court "underst[ood] Mother's concern," and stated that "[n]othing prevent[ed] Father from giving all the gifts in the world to the [C]hildren[] but doing it right at the exchange time [was] contributing to problems," and was "simply unnecessary." The record supports the trial court's inclusion of section 7 in the Parenting Plan. Mother testified that Father would present the Children with gifts at public functions, at medical appointments, and at exchanges. More specifically, Mother testified that there were instances where Isaiah would be dropped off at Father's house for visitation and, before he was in the house,

- 14 -

Father would give Isaiah a "prize." Mother also testified that Father would show up late to Isaiah's therapy appointments, interrupt the appointment, and give Isaiah a present. Isaiah's therapist's notes provide that Isaiah reported wanting to spend more time with Father "because he gets to play with all his toys and gifts," and that "the toys at [Mother's] house are boring." When asked on cross-examination about this provision, Mother testified:

> . . . . He can give them all the presents he wants on his own parenting time. He just can't show up during my parenting time and do it. He can't show up at their choir concert and try to keep them from going home with me by having something shiny and new. He does that kind of thing.

Although the trial court also approved sections 8 and 9, it failed to make any findings concerning same. Nevertheless, the record supports inclusion of these special provisions. Indeed, the record is replete with evidence that it is in Isaiah's best interest for the parents to have very limited interactions with each other. Sections 8 and 9 provide both parties with an equal opportunity to attend Isaiah's parties and events without the risk of them encountering one another. Concerning section 13, the trial court found that "the circumstances of this case make the GPS devices not an unreasonable request and the detail necessary." We agree. Mother testified that, when she traveled with the Children, she provided screenshots with exact details of the trip, including where the Children were staying, but that Father would not provide her with the same information. Rather, Mother testified that, on several occasions when Father traveled with the Children, he refused to provide her with their location. While the foregoing provisions may be unnecessary in most parenting plans, the specific facts of this case, including Father's behaviors throughout, make them necessary here. Indeed, the parties operate best under a plan that provides explicit details concerning how the parties are to interact (or not interact) with Isaiah and each other. As such, we conclude that the trial court did not abuse its discretion in including the foregoing provisions in the Parenting Plan.

### ii. Child Support

We now turn to Father's issues concerning child support. As this Court has explained, "[pa]rents have 'deeply rooted moral responsibilities' to support their minor children." *Richardson v. Spanos*, 189 S.W.3d 720, 724 (Tenn. Ct. App. 2005) (internal citations omitted). "In addition to this moral responsibility, Tennessee law imposes a legal obligation on parents to support their minor children in a manner commensurate with their own means and station in life." *Id.* (citing Tenn. Code Ann. § 34-1-102(a); *Wade v. Wade*, 115 S.W.3d 917, 920 (Tenn. Ct. App. 2002)). "Awards of child support are governed by the Child Support Guidelines [(the "Guidelines")] promulgated by the Tennessee Department of Human Services Child Support Services Division." *Taylor v. Fezell*, 158 S.W.3d 352, 357 (Tenn. 2005). When determining a child support award, trial courts shall apply the Guidelines as a rebuttable presumption. Tenn. Code Ann. § 36-5-

- 15 -

101(e)(1)(A). "The[] Guidelines are a minimum base for determining child support obligations," and the presumptive child support amount "may be increased according to the best interest of the child . . . [and] the circumstances of the parties[.]" Tenn. Comp. R. & Regs. 1240-02-04-.01(4). "Because child support decisions retain an element of discretion, we review them using the deferential 'abuse of discretion' standard." *Richardson*, 189 S.W.3d at 725.

### 1. Willfully Underemployed

As discussed above, because Father worked limited hours during the pendency of the divorce, the trial court imputed a gross monthly income of $3,293.00 and set his presumptive child support obligation at $531.00 per month. After Selah's death, the trial court modified Father's child support obligation to $397.00 per month. Father does not dispute that he worked limited hours, nor does he dispute the amount of imputed income. Rather, he appeals the trial court's finding that he was willfully underemployed.

The Guidelines provide that imputing additional gross income to a parent is appropriate when a trial court determines the parent "to be willfully underemployed or unemployed." Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)(2)(i)(I). While the Guidelines "do not presume that any parent is willfully underemployed or unemployed[,] . . . [t]he purpose of the determination is to ascertain the reasons for the parent's occupational choices, to assess the reasonableness of these choices in light of the parent's obligation to support his or her child(ren), and to determine whether such choices benefit the children." Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)(2)(ii). "A determination of willful underemployment or unemployment is not limited to choices motivated by an intent to avoid or reduce the payment of child support," but "may be based on any intentional choice or act that adversely affects a parent's income." Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)(2)(ii)(I)(I). The Guidelines provide the following factors for trial courts to consider when determining whether a parent is willfully underemployed or unemployed:

(I) The parent's past and present employment;

(II) The parent's education, training, and ability to work;

(III) The State of Tennessee recognizes the role of a stay-at-home parent as an important and valuable factor in a child's life. In considering whether there should be any imputation of income to a stay-at-home parent, the tribunal shall consider:

> I. Whether the parent acted in the role of full-time caretaker while the parents were living in the same household;

> II. The length of time the parent staying at home has remained

- 16 -

out of the workforce for this purpose; and

III. The age of the minor children.

(IV) A parent's extravagant lifestyle, including ownership of valuable assets and resources (such as an expensive home or automobile), that appears inappropriate or unreasonable for the income claimed by the parent;

(V) The parent's role as caretaker of a handicapped or seriously ill child of that parent, or any other handicapped or seriously ill relative for whom that parent has assumed the role of caretaker which eliminates or substantially reduces the parent's ability to work outside the home, and the need of that parent to continue in that role in the future;

(VI) Whether unemployment or underemployment for the purpose of pursuing additional training or education is reasonable in light of the parent's obligation to support his/her children and, to this end, whether the training or education will ultimately benefit the child in the case immediately under consideration by increasing the parent's level of support for that child in the future; and

(VII) Any additional factors deemed relevant to the particular circumstances of the case.

Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)(2)(iii).

At the outset, we note that the trial court also found Father to be willfully underemployed at the July 2022 hearing, discussed *supra*, wherein the trial court found:

[Father] has testified that he has elected not to work presently, and he has cited among other reasons the health of his child. And the [c]ourt understands that, and the [c]ourt is conscious of the need and has even tried to make rulings to allow maximized time with his children, especially his very sick daughter; however, part of supporting his daughter also includes financially supporting her. He has not been the primary caretaker since he left employment, so this is not a circumstance where he left employment so as to, for example, become a full-time caretaker of a seriously ill child. Mother also has a seriously ill child and has – yet has an obligation to provide support and is doing so. Father has very candidly testified that while he has this – an issue with OCD, he's testified that his health – he has not testified to any other health problems. There has not been any demonstration to the Court that he is not capable of working. And so the Court is going to find that father is voluntary under . . . employed[.]

- 17 -

As discussed above, after this hearing, the trial court removed the parties' impromptu visits with Selah and reduced Father's parenting time due to his problematic behaviors. Accordingly, Father's regular visitation under the temporary parenting plan was from Friday at 5:00 p.m. through Sunday at 6:00 p.m., every other weekend. Father was also awarded visitation with Selah every other Friday from 9:00 a.m. until 10:30 a.m. Two months before trial, Father began receiving visits with Selah in the mornings on Tuesdays and Thursdays. Despite the foregoing, and despite the trial court's above findings, Father remained underemployed/unemployed at the time of trial.

In its findings of facts from the final trial, the trial court held:

Now, [F]ather's gross income, based on actual income for this year, he's earned $1,089.14 for 21 weeks of the calendar year, which is, if you do the math on that, that works out to he is earning approximately $224.74 a month. That's simply unsustainable. You can't bring children into the world and support them on that, notwithstanding any other issues. Even children who are ill require financial support. The [c]ourt finds [F]ather is willfully underemployed based on testimony in this matter that he's – at times, has quit working, stopped working. Although he stated his employment status remained, he has – he's underemployed under [the Guidelines], and the [c]ourt notes that determination of willful underemployment is not limited to choices motivated by intent to avoid or reduce payment of child support. In other words, . . . one can be willfully underemployed for reasons other than just trying to not pay as much. In this case, even if it's with good intentions, good faith intentions, [F]ather has chosen to be underemployed, and that simply can't sustain, because, regrettably, through this difficult situation these [C]hildren still have to be supported.

This Court has explained our standard of review concerning a trial court's willful underemployment finding, to-wit:

Determining whether a parent is willfully and voluntarily underemployed and what a parent's potential income would be are questions of fact that require careful consideration of all the attendant circumstances. *Richardson*, 189 S.W.3d at 726 (citing *Eldridge* [*v. Eldridge*, 137 S.W.3d 1, 21 (Tenn. Ct. App. 2002)]; *Willis* [*v. Willis*, 62 S.W.3d 735, 738-39 (Tenn. Ct. App. 2001)]). Thus, this [C]ourt reviews a trial court's determination regarding willful and voluntary underemployment using Tenn. R. App. P. 13(d) and accords substantial deference to the trial court's decision, *Willis*, 62 S.W.3d at 738, especially when it is premised on the trial court's singular ability to ascertain the credibility of the witnesses. *Richardson*, 189 S.W.3d at 726

- 18 -

(citations omitted).

***Owensby v. Davis***, No. M2007-01262-COA-R3-JV, 2008 WL 3069777, at *4 (Tenn. Ct. App. July 31, 2008).

At trial and on appeal, Father argues that his decision to limit his employment was "reasonable," because he "wanted to keep his schedule flexible so that he could be there for Selah[.]"[5] At trial, when asked why Father chose not to work on the Mondays through Fridays when he did not have visitation with the Children, Father testified that he "prioritized being at [his] [C]hildren's appointments[.]" When asked what Father accomplished on the days that he did not work, Father testified:

> I go to my children's appointments, I work around my house, I fix things inside the house, I make my house a home, I clean, I do all things necessary for taking care of a home, I pay bills, I – I take care of my home, I involve myself with my kids.

The record shows that the Children did not attend appointments every day of the week such that Father was consumed by them and unable to maintain any type of employment. Furthermore, as discussed at length above, Father was not the primary parent responsible for managing the day-to-day needs of the Children or their medical needs/appointments, and he exercised limited visitation with them. Rather, Mother was the parent that shouldered these responsibilities, and she did so while maintaining full-time employment. We also note that Father testified that part of the reason he stopped working was the downturn in his industry, and, despite requesting work, his current employer could not provide it. When asked why Father declined to pursue part-time employment elsewhere, Father cited his employer's kindness and understanding during a difficult time in Father's life. This is not a valid reason for Father's decision not to seek employment elsewhere. Father has a bachelor's degree, a master's degree, and a commercial driver's license, and he is able bodied. As such, he could have pursued some form of employment during the course of these proceedings. While this Court is very sympathetic to the parties' situation, we agree with the trial court that Father made an intentional choice to limit his employment, which adversely affected his income, and consequently, limited his ability to provide

---

[5] As support for this argument, Father cites ***State ex rel. Brown v. Brown***, No. M2014-02497-COA-R3-CV, 2016 WL 506732 (Tenn. Ct. App. Feb. 8, 2016). Briefly, in that case, the mother quit her job due to a lengthy commute affecting her ability to maximize her visitation with the child. *Id.* at *2. Following her resignation, Mother enrolled in school full-time to become a radiology technician and obtained full-time employment in the healthcare field, although she earned less than she did at her previous job. *Id.* Based on these facts, the trial court found that the mother was not willfully underemployed and this Court agreed. Id. at *5. ***Brown*** is easily distinguishable from the case before this Court as the record clearly shows that Father has not maintained full-time employment nor has he pursued additional training or education.

financial support for the Children.  In short, Father's decision did not benefit the Children.  Our conclusion may have been different if the record showed that Father was the Children's primary caretaker, but the opposite is true here.  While Father's decision may have been made with "good faith intentions," as the trial court found, his unemployment is unsustainable because children require financial support.  This is especially true with divorcing parties where the family transitions from one household to two, thus increasing living expenses.  Accordingly, we conclude that the evidence does not preponderate against the trial court's findings, and we affirm the trial court's conclusion that Father was willfully underemployed.

## 2.  Upward Deviation

The trial court awarded an upward deviation in Father's child support obligation based on the parties' mutual desire for Isaiah to attend a private school.  The trial court found that 50% of the tuition for Isaiah's school was $408.00 per month and awarded this amount as the upward deviation in Father's child support obligation.  Father argues this was error.  On this Court's review, we conclude that Father waived this argument.  At trial, Father testified as follows:

> Q. All right. Now, for whatever reason, if this [50/50] parenting plan were not adopted, is private school tuition something that you are able to sustain financially?
>
> A. I – I certainly intend to.
>
> Q. Okay.
>
> A. And I'm committing to doing that. Like I – I mean, I told [the GAL] that I thought it was in Isaiah's best interest to not have to transition schools again, *so I'm a man of my word. I will – I will figure out a way to pay half tuition*.

(Emphasis added).  Later, Father's counsel admitted that "the issue of an upward or extraordinary educational expense" was "moot" because Father testified "that he was going to figure out how to pay for private school tuition regardless[.]"  Despite the foregoing, Father now argues that the trial court's upward deviation in child support in an amount equal to half of the private school tuition should be reversed.  It is well-settled that "issues raised for the first time on appeal are waived." ***Black v. Blount***, 938 S.W.2d 394, 403 (Tenn. 1996).  Having testified, *unequivocally*, that he would "figure out a way to pay half tuition," Father cannot now argue that the trial court's order that he do so was error.  Accordingly, we affirm the upward deviation in Father's child support obligation for Isaiah's private school tuition.

- 20 -

## C. Division of Marital Property

We now turn to Father's issues concerning the division of marital property, which are two-fold. First, Father argues that the trial court failed to make relevant findings of fact concerning Tennessee Code Annotated section 36-4-121(c). Next, he contends that the trial court's division of marital property was inequitable. At the outset, we note that Father does not dispute the trial court's *classification* or *valuation* of marital property. Rather, Father's arguments concern only the *division* of marital property. "In all actions for divorce or legal separation, the court . . . may . . . equitably divide, distribute or assign the marital property between the parties without regard to marital fault in proportions as the court deems just." Tenn. Code Ann. § 36-4-121(a)(1). In making an equitable division, courts are instructed to consider all relevant factors, including those enumerated in Tennessee Code Annotated section 36-4-121(c), discussed further *infra*.

The record shows that the parties were married for nine years and had no separate property. As discussed above, at the time of the divorce, Mother was gainfully employed, and Father, although voluntarily unemployed, was capable of working. Under the trial court's division of marital assets, without including his portion of equity from the marital residence, Father was awarded: (1) a Honda Civic, valued at $10,800.00; (2) his bank accounts, valued at $688.00; (3) his retirement accounts, valued at $9,393.00; and (4) his furniture, valued at $11,600.00, which totaled $32,481.00. Without including her portion of equity from the marital residence, Mother was awarded: (1) a Honda Odyssey, valued at $13,000.00; (2) her bank accounts, valued at $11,330; (3) her retirement accounts, valued at $12,489.00; and (4) her furniture, valued at $3,500.00, which totaled $40,319.00. As to the marital residence, the trial court: (1) valued it at $160,000.00; (2) found that $57,729.00 remained on the mortgage; and (3) found that the parties had $102,271.00 in equity in the house. The only other debt incurred during the marriage was a $57,315.00 loan to Father from his parents. Based on the foregoing, the marital estate contained $232,800 in assets and $115,044 in debt, for a net value of $117,756.00.

As shown above, the marital residence was the major asset to be divided in the marital estate, and the loan to Father was the major debt to be allocated. Concerning the marital residence, the trial court found:

> The [c]ourt values the property at $160,000.00, and the debt on that property is $57,729.00, which results in equity of $102,271.00 based on the [c]ourt's findings. [Using] that number alone . . . I've rounded so that [Mother] has $51,135.00 of that equity, [and Father] has $51,136.00 of that equity.

The trial court then awarded Father the marital residence, on the condition that he was able to refinance the property within ninety days and pay Mother her share of the equity. If Father was unable to refinance the property, the trial court ordered that it would be listed for sale, and that the parties would split the net proceeds equally. As to the loan from

Father's parents, the trial court found:

> [Father] has alleged that he has a debt in the amount of $57,315.00 owed to his . . . parents . . . for monies they have loaned to him during the pendency of this litigation to assist with living expenses and attorneys' fees. Whether or not an intrafamily transfer is a loan or a gift is a question of fact. [Father] has produced four loan agreements between himself and his parents in the total amount of $57,315.00. The agreements do not provide monthly payment amounts. They do indicate payments are to begin in July of this year – July 1, 2023. The [c]ourt will note that the terms of repayment on Agreement 1 are, to some extent, incomplete based upon some handwritten modification to that agreement for a loan amount of $2,200.00. Nonetheless, the [c]ourt has looked at all of this. The [c]ourt has struggled with it, frankly, because there's – there's some question as to whether it's really a loan, or is it a gift, but, in the absence of any proof to the contrary, the [c]ourt finds that it is – it is not rebutted successfully that this was[n't] a loan, and, therefore, the [c]ourt finds that this amount was, in fact, a loan incurred during the marriage for a total amount of $57,315.00, and that has to be allocated.

> . . . Based upon case law, this is a marital debt, and not only based upon case law, but based upon the recently modified Tennessee Code Annotated . . . 36-[4]-121(i) which addressed how debt is to be allocated.[6] That statute indicates that the [c]ourt, in considering how to allocate that, is to consider the purpose of the debt, who incurred it, who benefited from it, and who can best repay it. It's clear that it was incurred by [Father], it was incurred for the purpose of helping him with living expenses and his attorney's fees, and he's the person who essentially benefited from it. As to who can best repay it, based on the superior earning capacity, [Mother] probably is in the best position, technically, to repay it, but the [c]ourt's going to allocate the entirety of this debt to [Father].

Based on the foregoing findings, the trial court divided the marital estate as follows:

> Now, the [c]ourt's got some concerns. . . . [T]he [c]ourt notes that [Father] has incurred some of [the $57,315.00] debt based upon his choice to stop working[.]

> So, this debt is being assigned to [Father], which will change the amount of equity and the percentages of property and debt allocation. This

[6] We note that the portion of the statute to which the trial court refers was not in effect when Mother filed for divorce. However, because Father does not raise as an issue the allocation of the $57,315.00 debt to him, we need not address the trial court applying the statute here.

creates a net equity of $117,756.00 [in the marital estate], and if the [c]ourt made no other adjustment to this matter, [Mother] would be receiving, then, 78 percent of that amount, and [Father] would be receiving 22 percent of that amount, which the [c]ourt finds is not equitable, but – in fact, it's less equitable, and on its face, without context, it might even raise eyebrows, but the [c]ourt wants to make note in the findings the [c]ourt has considered how this debt came about. It came about essentially because of [F]ather's voluntary . . . underemployment and his decision to largely leave the workforce, and he's continued to do so despite prior hearings where he was found underemployed, and he even took out one of those loans during the same month that this court hearing is going to take place. Further, [Father's] family has not pressed him for repayment, and he's made no repayments to date, which also raises concern to the [c]ourt that this could ultimately transform into a gift, notwithstanding how it's characterized. That being said, on the other side of the coin, the [c]ourt realizes that some of this all came about, not like it might come about in other divorce actions the [c]ourt sees, but the [c]ourt does feel that a lot of this came about and is directly attributable to Selah's medical condition and not necessarily ill intent, although she and Isaiah must still be supported, notwithstanding her diagnosis.

Given the foregoing, the trial court adjusted the division of marital property, "by moving $10,000.00 from the amount of [Mother's] share of equity [in the marital residence] to [Father's] column." This resulted in Mother receiving $81,454.00, or 69% of the marital estate, and Father receiving $36,302.00, or 31% of the marital estate. The trial court found this division to be equitable.

The division of marital property in an "equitable" manner does not require that the trial court divide it *equally*. **Luplow v. Luplow**, 450 S.W.3d 105, 109-10 (Tenn. Ct. App. 2014) (citing **Robertson v. Robertson**, 76 S.W.3d 337, 341 (Tenn. 2002)). Furthermore, an equitable division "is not achieved by a mechanical application of the statutory factors, but rather by considering and weighing the most relevant factors in light of the unique facts of the case." **Batson v. Batson**, 769 S.W.2d 849, 859 (Tenn. Ct. App. 1988). A trial court is given "wide latitude" in its equitable division of a marital estate, and this Court defers to such division unless it is inconsistent with the relevant factors in Tennessee Code Annotated section 36-4-121(c) or is not supported by a preponderance of the evidence. **Kinard v. Kinard**, 986 S.W.2d 220, 230 (Tenn. Ct. App. 1998).

On appeal, Father alleges that the trial court failed to apply any of the factors in Tennessee Code Annotated section 36-4-121(c) to the facts of this case. We disagree. Although the trial court did not explicitly address the section 36-4-121(c) factors, it is clear from its findings that the trial court considered: (1) the employability, financial liabilities, and financial needs of each party, Tenn. Code Ann. § 36-4-121(c)(2); (2) the economic

- 23 -

circumstances of each party at the time the division became effective, Tenn. Code Ann. § 36-4-121(c)(8); and (3) "[s]uch other factors as are necessary to consider the equities between the parties." Tenn. Code Ann. § 36-4-121(c)(12). As to the final factor, the trial court clearly placed great weight on Father's choice not to work and to instead incur a significant debt to pay for his living expenses and attorney's fees.

In his appellate brief, Father's sole argument as to why the division of marital property was inequitable is simply because Mother received 69% of the marital estate, and he received 31%. Father suggests that awarding him the entirety of the equity in the marital residence would achieve an equitable result. If we were to follow Father's suggestion, he would be awarded approximately 66% of the marital estate, and Mother would be awarded approximately 34% — percentages very close to the trial court's division, simply in favor of Father, rather than Mother. At oral argument, Father's counsel acknowledged that the proposal in Father's brief would result in a similar division to what the trial court ordered but in Father's favor. In so doing, counsel mentioned a 50/50 division of marital property and asked this Court to award what was "equitable," stating that Father receiving 31% of the marital estate was inequitable. This Court has concluded that divisions of marital estates were equitable when one party received a more significant portion of the estate than his or her spouse. *See Perkins v. Sloane*, No. M2024-00756-COA-R3-CV, 2025 WL 1100057, at *10 (Tenn. Ct. App. Apr. 14, 2025) (affirming an equitable division where the husband received 80% of the marital estate and the wife received 20%); *Harris v. Harris*, No. E2023-00061-COA-R3-CV, 2023 WL 8716469, at *9 (Tenn. Ct. App. Dec. 18, 2023) (adjusting the division of the marital estate to award the husband 75% and the wife 25%). Indeed, we do not determine equitability based solely on the percentages awarded to each party. Rather, every case presents its own unique circumstances, and we review a trial court's findings to determine whether the trial court's division of the marital property based on *the circumstances in that case* is equitable. Although Father makes no argument concerning the substantive division of the marital estate, we conclude that the trial court's division in this case was equitable. As noted in its findings, the trial court awarded Father a smaller percentage of the marital estate because he was assigned the $57,315.00 debt owed to his parents. The trial court found, and the record supports, that the marital estate incurred this debt because Father made the decision to be underemployed/unemployed during the pendency of the divorce, even after the trial court found him underemployed in previous hearings. Furthermore, the trial court found that Father's parents have not pressed him for repayment, and the trial court was concerned that this debt could turn into a gift to Father. Indeed, when asked if Father's parents were "hounding" him about repayment of the debt, Father testified: "No, they are not, and they have no intention of doing so, to my knowledge." When asked "What was the agreement about when and how [Father] would start to pay [the loan] back," Father testified, "I don't recall the exact date or the exact way, but what I have communicated to them, what they've said they're fine with is I pay it back as I can, as I'm able." We note that, if the loan was transformed into a gift, as the trial court suspected may happen, Father would receive approximately 53% of the marital

estate.[7]  Based on the foregoing, we affirm the trial court's division of the marital estate.

## D. Inappropriate Marital Conduct as Ground for Divorce

Next, we address whether the trial court erred in finding that Father emotionally abused and stalked Mother.  Although not stated as such, Father's issue concerns the trial court's granting Mother a divorce on the grounds of inappropriate marital conduct. Concerning a trial court's award of divorce under the grounds of inappropriate marital conduct, this Court has explained:

Grounds for divorce are governed by statute in Tennessee. ***Chastain v. Chastain***, 559 S.W.2d 933, 934 (Tenn. 1977). One cause of divorce of importance to this case is when "[t]he husband or wife is guilty of such cruel and inhuman treatment or conduct towards the spouse as renders cohabitation unsafe and improper which may also be referred to in [the] pleadings as inappropriate marital conduct . . . ." Tenn. Code Ann. § 36-4-101(11) (2001). Essentially, inappropriate marital conduct is when "either or both of the parties [have] engaged in a course of conduct which (1) caused pain, anguish or distress to the other party and (2) rendered continued cohabitation 'improper,' 'unendurable,' 'intolerable,' or 'unacceptable.'" ***Earls v. Earls***, 42 S.W.3d 877, 892 (Tenn. Ct. App. 2000) (Cottrell, J., concurring) (citations omitted).

The trial court's assessment of witness credibility is important when deciding whether a party should be awarded a divorce on the grounds of inappropriate marital conduct. ***Newberry v. Newberry***, 493 S.W.2d 99, 101 (Tenn. Ct. App. 1973). In ***Newberry***, we stated that "[t]he existence of such continuous refined cruelty can best be determined by the trier of facts who has seen the parties face to face and who has observed their manner and demeanor as well as that of their respective witnesses." ***Id.***

***Eldridge***, 137 S.W.3d at 23-24.

In its oral findings of fact, the trial court opined:

Taking the totality of the evidence into account, the [c]ourt finds that, in this case, the husband, Mr. Cali, is the party against whom the divorce shall be granted. He's engaged in a long pattern of behaviors which may or may not have anything to do with the diagnosis he's conceded, which have, nonetheless, had the effect which, in the [c]ourt's opinion, result in being

---

[7] If the debt transformed into a gift, the net equity in the marital estate would be $175,071, and Father would receive $93,617, or approximately 53% of the marital estate.

emotionally abusive toward the wife. He's engaged in instances of stalking that have been demonstrated, including the episode with the car chase to Memphis for the play which the parties had attempted to see. I will not restate all the details. Both parties have given conflicting descriptions of that, and the [c]ourt finds Ms. Cali's testimony to be more credible in regard to what happened. The [c]ourt finds he has – that is, Mr. Cali – has engaged, during the marriage, in verbal harassment and belittling comments and that he has failed to provide consistent financial support to the marriage to the extent that is needed and has failed to be communicative on that subject, so I state all of that because grounds have to be established. It's not my intention to punch downward or otherwise make anyone feel bad, but the record has to be made.

As discussed at length throughout this Opinion, the record supports the trial court's findings that Father engaged in conduct that caused Mother distress and rendered their continued cohabitation intolerable. We note that, contrary to Mother's testimony, Father testified that he rarely initiated arguments with her. He wholly denied: (1) any verbal or emotional abuse; (2) that he ever trapped Mother inside the house; or (3) that he belittled or demeaned her. We defer to the trial court's explicit and implicit findings that Mother was more credible in her testimony than Father. Aside from Mother's testimony, Mother entered as an exhibit at trial, several pages of the parties' communications via the Our Family Wizard application. Father's own words in these communications demonstrate some of the foregoing concerning behavior. Furthermore, the record shows many other instances of concerning behavior, including emotional abuse, which not only precipitated this divorce, but also led the trial court to implement a strict and specific parenting plan. In short, the record supports the trial court's above findings, and we affirm the trial court's decision granting Mother a divorce under inappropriate marital conduct.

### E. Mother's Appellate Attorney's Fees

Mother asks this Court to award her attorney's fees incurred on appeal. In Tennessee, "litigants are responsible for their own attorney's fees absent a statute or agreement between the parties providing otherwise." *Darvarmanesh v. Gharacholou*, No. M2004-00262-COA-R3-CV, 2005 WL 1684050, at *16 (Tenn. Ct. App. July 19, 2005) (citing *State v. Brown & Williamson Tobacco Corp.*, 18 S.W.3d 186, 194 (Tenn. 2000)). Tennessee Code Annotated section 36-5-103(c) allows this Court, in its discretion, to award attorney's fees "in regard to any suit or action concerning the adjudication of the custody . . . of any child[.]" Tenn. Code Ann. § 36-5-103(c). It is within the sole discretion of this Court whether to award a party attorney's fees on appeal. *Hill v. Hill*, No. M2006-02753-COA-R3-CV, 2007 WL 4404097, at *6 (Tenn. Ct. App. Dec. 17, 2007); *Archer v. Archer*, 907 S.W.2d 412, 419 (Tenn. Ct. App. 1995). In exercising our discretion, we grant Mother's request for appellate attorney's fees.

## V. Conclusion

For the foregoing reasons, we affirm the trial court's order. Mother's request for appellate attorney's fees is granted. The case is remanded for such further proceedings as may be necessary and are consistent with this opinion, including, but not limited to, a calculation of Mother's reasonable attorney's fees and costs incurred in this appeal and for entry of judgment on same. Costs of the appeal are assessed to the Appellant, Robert George Cali. Execution for costs may issue if necessary.


_s/ Kenny Armstrong_
KENNY ARMSTRONG, JUDGE